## S04A1160. BROWN v. THE STATE.
(609 SE2d 312)

HINES, Justice.

Jamie Kenmont Kerien Brown appeals his convictions for felony murder, aggravated assault, criminal attempt to commit armed robbery, and possession of a firearm during the commission of certain crimes.[1] For the reasons that follow, we affirm.

Construed to support the verdicts, the evidence showed that on the evening of April 20, 1991, Everett and Louise Chastain, and their son Clay, were robbed at gunpoint in a restaurant parking lot by Brown and co-indictee Tutt. Brown and Tutt then entered a car which Clay Chastain described as a dirty white Ford Grenada with a missing gas cap.

---

[1] The crimes occurred on April 20, 1991 and April 22, 1991. On July 9, 1991, a Richmond County grand jury indicted Brown for the following offenses: (1) malice murder of Victor Hall; (2) felony murder of Hall with aggravated assault as the underlying felony; (3) criminal attempt to commit armed robbery of Hall; (4) possession of a firearm during the murder and the criminal attempt to commit armed robbery of Hall; (5) armed robbery of Phillip Gettle; (6) aggravated assault of Gettle; (7) possession of a firearm during the armed robbery and the aggravated assault of Gettle; (8) criminal attempt to commit armed robbery of Gene Staulcup; (9) aggravated assault of Staulcup; (10) possession of a firearm during the criminal attempt to commit armed robbery and the aggravated assault of Staulcup; (11) armed robbery of Andy Cone, Jr.; (12) possession of a firearm during the commission of the armed robbery of Cone; (13) armed robbery of Everett Chastain; (14) armed robbery of Louise Chastain; (15) armed robbery of Clay Chastain; and (16) possession of a firearm during the commission of the armed robberies of the Chastains. Brown was convicted of all counts in the indictment, but his convictions were reversed on appeal due to the erroneous admission of portions of his testimony from a motion to suppress hearing. *Brown v. State*, 264 Ga. 803 (450 SE2d 821) (1994). Brown was retried April 17, 1995 to April 21, 1995. The jury found him not guilty of the two charges involving Cone (counts 11 and 12), and could not reach verdicts on the malice murder charge and the charges involving the Chastains (counts 1 and 13-16). Brown was found guilty of the remaining charges. He was sentenced to life in prison for the felony murder of Hall and for the armed robbery of Gettle, twenty years each for the aggravated assault of Gettle and the aggravated assault of Staulcup, ten years each for the criminal attempt to commit armed robbery of Hall and the criminal attempt to commit armed robbery of Staulcup, and five years each for the three possession of a firearm during the commission of crimes against Hall, Gettle, and Staulcup, with all sentences to be served consecutively to each other. Brown filed a motion for new trial on June 19, 1995. The motion was denied on November 20, 2002. Brown did not file a notice of appeal within the requisite 30-day time period, and on January 24, 2003, the trial court issued an order allowing Brown to file an out-of-time notice of appeal; that same day, Brown filed his notice of appeal. The case was docketed in this Court on March 18, 2004, and submitted for decision on May 10, 2004.

That same evening, Kenneth Andy Cone, Jr. was confronted by Brown and another man outside a high school. The other man put a pistol to Cone's side, and Brown took his wallet.

Also that evening, Franklin Eugene Staulcup was using a public telephone at a gas station when Brown walked up to him, put a .45 caliber handgun to his head, and demanded money, threatening to kill Staulcup if he did not comply. Staulcup resisted, and Brown hit him in the head with the handgun; Staulcup was able to escape.

On April 22, 1991, Phillip Gettle was cleaning the air conditioning vent at a convenience store when Brown and another man approached him from behind. Both men displayed handguns, and Brown pointed one at him; his wallet was taken. The two men discussed which one would shoot Gettle, who turned and began to run away. Gettle heard a shot and felt a bullet go through his shoulder; he did not see which man fired the shot. The men then entered Brown's car, and Brown drove away.

On that same evening, Victor Hall, a taxicab driver, was dispatched to a certain address to pick up a customer. At approximately 9:00 p.m., Clay Bagby saw Hall's taxicab roll across the street and into a tree. He also saw someone exit the cab and run behind another person. Hall was behind the steering wheel, slouched to the side with a bullet hole in his back. After the ambulance left, Bagby saw Brown standing on the street corner, and realized that Brown was dressed like the person he saw exiting the cab. Hall bled to death.

On April 23, 1991, police officers were issued a lookout for a white Ford Grenada with a missing gas cap, and were advised that its occupants were armed and dangerous and had been involved in a murder, armed robberies, and assaults. Officer Dennis West was involved in the stop of a vehicle matching that description. West saw a .45 caliber handgun on the front passenger floorboard. The four occupants of the vehicle, which included Brown, were placed in different police cars and taken to the police station. Brown admitted that the handgun found in the vehicle belonged to him.

Later that evening, Brown made a custodial statement to the police. He said that both he and Tutt displayed pistols during the robbery of Gettle, and that Tutt shot Gettle. As to the shooting of Hall, Brown said that: Tutt approached him and said that he had to make some money and told Brown that they were going to rob a taxi driver; Brown did not want to commit another robbery; Tutt asked him whether they were "going to be men or mice"; Brown responded that they would be men and told Tutt to "just tell me what we're going [to] do"; they discussed the plan for the robbery; Brown was not armed; both he and Tutt got into the backseat of the taxi; Tutt pointed a gun

at Hall, who grabbed Brown; Tutt shot Hall; Brown and Tutt ran from the taxi; both entered Brown's car; and Brown let Tutt out on another street.

1. Brown asserts that the evidence adduced at trial was insufficient to sustain a guilty verdict as to the crime of felony murder of cab driver Hall during the commission of aggravated assault with a deadly weapon, because the evidence was insufficient to show that he committed the underlying felony alleged in the indictment, aggravated assault. More specifically, Brown argues that there was insufficient evidence to show that he was an accomplice of the person who was in possession of the pistol at the time of the shooting. Brown testified that he was "merely present" when co-indictee Tutt shot Hall, and contends that this is supported by the physical evidence, such as ballistic examinations which revealed that the cartridge shell found in the cab was not matched to the handgun found in Brown's vehicle the next day.

However, evidence shows that Brown was not merely present at the crime scene, but was an active participant. A party to a crime is one who intentionally aids or abets the commission of the crime. OCGA § 16-2-20. "Whether a person is a party to a crime may be inferred from that person's presence, companionship, and conduct before, during, and after the crime." (Citation and punctuation omitted.) *Hewitt v. State*, 277 Ga. 327, 329 (588 SE2d 722) (2003). While Brown claims that he felt coerced to be present when Hall was killed, he was seen making notes at the crime scene the day of the shooting, he accompanied Tutt knowing that Tutt intended to rob the cab driver, and he drove Tutt away after the shooting. See *Tho Van Huynh v. State*, 257 Ga. 375, 377 (359 SE2d 667) (1987) ("It matters not whether it was the appellant or (his accomplice) who actually fired the gun during the robbery. . . . The act of one was the act of the other in the commission of the [aggravated assault] and the ensuing death which resulted therefrom.") (citations and punctuation omitted). The jury was authorized to find that Brown was a party to the crime of aggravated assault committed with a deadly weapon, and hence to felony murder.

The evidence was sufficient to enable a rational trier of fact to find Brown guilty beyond a reasonable doubt of all the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. The trial court denied Brown's motion to suppress his statements to police. He contends that the trial court erred in failing to grant the motion because his warrantless arrest was without probable cause, and the statements made thereafter were the result of an illegal arrest. See *Burnham v. State*, 265 Ga. 129 (453 SE2d 449) (1995). When ruling on such a motion, the trial court sits as the trier

of facts, and its findings regarding them are not disturbed on appeal if there is any evidence to support them; the trial court's decisions with regard to questions of fact and credibility must be accepted unless clearly erroneous, and a reviewing court construes the evidence most favorably to the trial court's findings. *Tate v. State*, 264 Ga. 53, 54 (1) (440 SE2d 646) (1994).

"A 'warrantless arrest' is constitutionally valid if . . . the arresting officer has probable cause to believe the accused has committed or is committing an offense. . . . [Cit.]" *Brown v. State*, 262 Ga. 728, 729 (2) (a) (425 SE2d 856) (1993). Probable cause exists if the arresting officer has reasonably trustworthy information that would allow a reasonable person to believe the accused committed a crime. Id. Brown asserts that there was no probable cause in this case because the only information available to the police at the time the vehicle was stopped was the generic description of a white Ford Grenada with a missing gas cap. But this assertion fails.

A vehicle stop pursuant to a police lookout requires specific and articulable facts which, together with rational inferences drawn therefrom, reasonably warrant the intrusion. *Bright v. State*, 265 Ga. 265, 279 (5) (a) (455 SE2d 37) (1995). At the time of the stop, the police knew the vehicle's color, manufacturer and model, the race and gender of its occupants, that there were at least two occupants, and that the car was missing its gas cap.[2] This detailed information provided the police with the requisite articulable suspicion to warrant the investigative stop and detention. See *Thomason v. State*, 268 Ga. 298, 301-302 (2) (a) (486 SE2d 861) (1997); *Hestley v. State*, 216 Ga. App. 573, 574 (1) (455 SE2d 333) (1995). And, when stopping individuals for questioning, law enforcement officers are entitled to take reasonable steps to protect their own safety. *State v. Williams*, 264 Ga. App. 199, 203 (590 SE2d 151) (2003). It is not unreasonable for officers stopping a car reportedly involved in numerous violent crimes to temporarily, and separately, detain the occupants.

During the stop, the officers saw the .45 caliber handgun on the floorboard of the front passenger compartment. Information about that weapon, together with the other circumstances set forth in the police advisory and confirmed by observation at the scene of the vehicle stop, gave the police officers probable cause to take Brown into custody. See *Thomason*, supra at 303 (2) (c); *Brown*, supra.

3. Brown further contends that his custodial statement to police was not voluntary because it was induced by Investigator McCann with the "hope of benefit" of having no criminal charges filed against

---

[2] The car stopped was a Mercury Monarch rather than a Ford Grenada; evidence showed the two cars are indistinguishable.

him.[3] "To make a confession admissible, it must have been made voluntarily, without being induced by another by the slightest hope of benefit or remotest fear of injury." OCGA § 24-3-50. Brown claims that McCann told him that he would soon be free to go without any charges being filed, which constituted a hope of benefit. While the "slightest hope of benefit" can mean hope of a lighter sentence, *State v. Ray*, 272 Ga. 450 (531 SE2d 705) (2000), there is no evidence that McCann led Brown to believe that he would receive a lighter sentence, or immediate freedom, if he confessed to the crimes. In his testimony, Brown does not contend that McCann mentioned a confession or sentence, only that McCann periodically stated that Brown would soon be released, while questioning continued; nothing suggested that freedom would be forthcoming if Brown confessed to committing crimes.

Brown also claims that McCann intended for Brown to overhear Tutt's statements implicating him in the shooting so that he would confess. However, the use of trickery by police does not render a confession inadmissible, so long as the means employed are not calculated to procure an untrue statement. *DeYoung v. State*, 268 Ga. 780, 789 (8) (493 SE2d 157) (1997). Even if McCann allowed Brown to overhear Tutt's implication of him, there is no evidence that he was attempting to procure an untrue statement from Brown. Thus, we will not disturb the trial court's findings that Brown's statements were freely and voluntarily given. *Tate*, supra.

4. On the authority of *Batson v. Kentucky*, 476 U. S. 79 (106 SC 1712, 90 LE2d 69) (1986), Brown challenged the State's exercise of its peremptory strikes against five African-American members of the jury venire.

> The evaluation of a *Batson* challenge involves a three-step process: (1) the opponent of a peremptory challenge must make a prima facie showing of racial discrimination; (2) the proponent of the strike must then provide a race-neutral explanation for the strike; and (3) the court must decide whether the opponent of the strike has proven discriminatory intent. [Cit.]

*Thomas v. State*, 274 Ga. 156, 161 (5) (549 SE2d 359) (2001). A trial court's finding as to whether the opponent of a strike has proven discriminatory intent is entitled to great deference and will not be

---

[3] Prior to making this statement, Brown was advised of his rights under *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966).

overruled unless clearly erroneous. *Barnes v. State*, 269 Ga. 345, 350 (6) (496 SE2d 674) (1998).

As the trial court did not rule as to whether Brown made a prima facie showing of racial discrimination, but proceeded to an evaluation of the State's explanations for its strikes, the issue of a prima facie showing is moot. *Raheem v. State*, 275 Ga. 87, 90 (4) (560 SE2d 680) (2002).

The State's first peremptory strike of an African-American potential juror was directed at a youth counselor who was a psychology student. The prosecutor explained that, in his experience, jurors with counseling and psychology backgrounds tend to require more than proof beyond a reasonable doubt. The State similarly struck a white female psychology professor. This is a race-neutral explanation. See *Durham v. State*, 185 Ga. App. 163, 166 (3) (363 SE2d 607) (1987).

The State struck the second prospective juror because she was the cousin of another member of the jury panel. The prosecutor asserted that having family members on the jury could dilute "individual analysis," and that he would "always" attempt to eliminate jurors with such relationships. Likewise, the State struck another prospective African-American juror because she was an acquaintance of a fellow juror. The trial court did not err in determining that the relationships between the jurors in these instances constituted race-neutral reasons for exercising the strikes. The prosecutor explained that the fourth prospective African-American juror was struck because he recognized Brown from going to school with him. A classmate relationship may constitute a race-neutral reason for a strike. See *Lyons v. State*, 271 Ga. 639, 642 (5) (522 SE2d 225) (1999). Finally, the last prospective juror was struck because of her relationship with a potential witness. Such a relationship is also a race-neutral reason to strike. See *Aldridge v. State*, 222 Ga. App. 437 (1) (475 SE2d 195) (1996). Accordingly, there is no error shown in the trial court's determination that the State employed racially neutral criteria to exercise its peremptory challenges.

5. Immediately prior to trial, Brown stated to the court that he was unhappy with his counsel because of a lack of communication, and requested a continuance. The trial court informed him that he did not have his choice of appointed counsel, that appointed counsel were competent, and noted that appointed counsel had succeeded in securing a reversal of his prior convictions.

"Whether to grant a motion for continuance is entirely within the sound discretion of the trial court and will not be disturbed absent a clear abuse of discretion." *Greene v. State*, 274 Ga. 220, 221 (3) (552 SE2d 834) (2001). A trial court is entitled to prevent a defendant from using a request for change of counsel as a dilatory tactic, and a defendant requesting a continuance for that purpose must show that

he has used due diligence in pursuing other counsel. *McConnell v. State*, 263 Ga. App. 686, 687 (1) (589 SE2d 271) (2003). While Brown asserted that his reason for requesting a continuance was lack of communication with counsel, he has not shown that any material circumstances changed since the first trial or that counsel were unprepared for the second trial. As both attorneys were familiar with the case from the first trial and appeal, and as Brown did not show any diligence in attempting to obtain other counsel, the trial court did not abuse its discretion in denying the request for a continuance.

6. Brown contends that the trial court erred in allowing him to be tried while wearing prison clothes. However, Brown did not raise any question regarding his attire until the evidentiary hearing on his motion for new trial, well after the trial concluded. Thus, he failed to preserve any error. See *Timmons v. State*, 223 Ga. 450 (1) (156 SE2d 68) (1967).

7. Brown contends that the trial court denigrated defense counsel by referring to them during the trial as "old goats." However, taken in context, the comment clearly was not intended to insult defense counsel.[4] Nor was it perceived as an insult: Brown's counsel testified at the motion for new trial hearing that the court's remark was taken in jest, and that it was not meant in a disparaging sense. There is no showing that the comment was in any way prejudicial to Brown's case. Furthermore, any error possibly produced by this remark was rendered harmless when the court instructed the jury that its determination of Brown's guilt or innocence was to be made "uninfluenced by any intimation or any expression from or by the court." See *Adams v. State*, 264 Ga. 71, 75 (7) (440 SE2d 639) (1994).

8. Brown contends that the trial court incorrectly instructed the jury regarding circumstantial evidence, coercion, and aggravated assault. However, Brown failed to preserve any error for review; he neither objected to the charges, nor reserved the right to object in a motion for new trial or on appeal. See *Drepaul v. State*, 275 Ga. 50 (2) (561 SE2d 825) (2002); *Turner v. State*, 272 Ga. 441, 442 (2) (531 SE2d 354) (2000). When the trial court asked for exceptions to the jury charge, defense counsel replied: "Not at this time, Your Honor." "The mere insertion of the caveat 'at this time' is a far cry from a reservation of objections to a later time. . . ." (Citation and punctuation

---

[4] When victim Gettle was asked if he saw either of the men who robbed and shot him, he identified Brown as "the man sitting behind the two gray-haired gentlemen." The State asked that the record reflect that Gettle identified Brown, and the court stated: "He's also correctly identified those old goats that represent him." One of Brown's attorneys then said: "Your honor, I must take exception." The court replied: "All right."

omitted.) *Cooper v. State*, 188 Ga. App. 297, 298 (2) (372 SE2d 679) (1988). See also *Palmer v. State*, 270 Ga. 278, 279 (2) (507 SE2d 755) (1998).

9. Finally, Brown asserts that he did not receive effective assistance of trial counsel because they failed to call co-indictee Tutt to testify in a manner similar to that which had been done in Brown's first trial; Brown contends that such testimony would have supported a coercion defense. In order to prevail on this claim, Brown must show both that counsel's performance was deficient and that the deficient performance was prejudicial to his defense. *Smith v. Francis*, 253 Ga. 782, 783 (325 SE2d 362) (1985), citing *Strickland v. Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984). However, counsel testified at the motion for new trial hearing that they decided as a matter of trial strategy to not call Tutt, and to instead contest the witnesses' identification of Brown. Interviews with Tutt convinced them that he would implicate Brown as a party to the crimes. Brown stated to the court prior to sentencing that counsel advised him against testifying and that he knew that his testimony would be inconsistent with the misidentification theory; nevertheless, he chose not to heed counsel's advice.

There is a strong presumption that counsel's actions are the result of sound trial strategy, and those actions are judged from counsel's perspective at the time of trial. *Strickland,* supra. The decision regarding which witnesses to present is a matter of trial strategy, see *Myers v. State*, 275 Ga. 709, 714 (4) (572 SE2d 606) (2002), and Brown has not shown that the decision of which he now complains was anything other than the pursuit of a reasonable strategy.

Further, Brown has not shown that the outcome of his trial would have been different if counsel had called Tutt to testify in support of a coercion defense. Brown's own testimony fully supported the State's contention that, if not the primary actor, he was at least a party to crimes committed by Tutt; Brown testified that he feared Tutt, who always carried a pistol. But, he did not testify that Tutt ever threatened him. Rather, Brown's testimony was that when Tutt approached Gettle to rob him, Brown was ten yards away, and that during the robbery, Brown showed his gun to Gettle when Tutt "looked at" him. He also testified that, after having seen Tutt shoot Gettle, and not wishing to accompany Tutt during any further crimes, he nonetheless drove Tutt to the location where Hall was to pick them up as taxicab passengers, let Tutt out of the car, drove his car to another location and parked it, and returned to Tutt on foot, and that Tutt was no threat to him after he had let him out of the car.

*Judgments affirmed. All the Justices concur.*

DECIDED NOVEMBER 23, 2004.

*Peter D. Johnson*, for appellant.

*Daniel J. Craig, District Attorney, Madonna M. Little, Assistant District Attorney, Thurbert E. Baker, Attorney General, Chad E. Jacobs, Assistant Attorney General*, for appellee.