## A89A1340. IN THE INTEREST OF M. J. H., a child.
### (388 SE2d 738)

BIRDSONG, Judge.

M. J. H. was adjudicated delinquent upon a petition alleging violation of Section 16-13-30 of the Georgia Controlled Substances Act for "possess[ion] with the intent to distribute a derivative of cocaine at I-285 and U. S. 41, Cobb County, Georgia, on the 26th day of November, 1988." The petition also alleged violation of OCGA § 16-11-106, "Possession of Firearm During Commission of Certain Crimes (Party to a crime), in that he did have in his possession a firearm to wit: a .22 caliber revolver while possessing with intent to distribute a

controlled substance [on November 26, 1988]."

On appeal M. J. H. asserts the trial court erred in refusing to dismiss the petition against M. J. H., because of the State's failure to prove anything more than mere presence at the scene of a crime in relation to M. J. H. Secondly, M. J. H. asserts the petition should have been dismissed for fatal variation in the allegata and probata, inasmuch as "crack," the substance found in possession, is not technically a "derivative" of cocaine, but is in fact cocaine. Finally, M. J. H. contends the adjudication of delinquency is contrary to the law and principles of justice and equity. *Held*:

1. The facts apparently not in dispute are these: On November 26, 1988, the arresting officers made the traffic stop of a late model Chevrolet traveling eastbound on I-285 in Cobb County, Georgia, at 2:30 a.m. As the vehicle was stopped in the emergency lane of I-285, two plastic bags, one containing 20 small plastic bags of crack cocaine and the other containing 26 small plastic bags of crack cocaine, and a .22 caliber handgun were thrown out of the passenger's window onto the ground approximately three feet from the vehicle. The arresting officers removed all five juveniles from the vehicle. No identification was produced by any of the five juveniles. Upon discovering the contraband and the handgun a few feet from the vehicle, the officers conducted a pat down of all the juveniles. No other weapons were discovered. The five juveniles were taken into custody and charged with possession of cocaine with intent to distribute and possession of a firearm during the commission of a crime. The arresting officers then conducted a search of the vehicle incident to arrest. The search produced $200 hidden under the back seat. In addition, quantities of cash were found on three of the juveniles but no money was found on M. J. H.

The State's crime lab expert testified that the items seized were cocaine and, chemically speaking, not a derivative of cocaine. The witness acknowledged however, that there is a distinction between how the word "derivative" is used in chemical terminology and how the word is used by laymen; that a "derivative" of cocaine, in laymen's terms, refers to other forms of cocaine besides the white powdery substance most commonly recognized. Crack cocaine is one such form.

In defense, three of appellant's co-defendants took the stand. Only the driver (A. B.), and appellant did not testify. The evidence showed that A. B. and K. B. T. and appellant's brother (A. H.), as well as D. P. had been selling drugs since about 1:00 or 2:00 in the afternoon before the arrest. The passenger in the front seat, co-defendant K. B. T., testified that the driver, co-defendant A. B., had tossed the crack cocaine into K. B. T.'s lap when the driver noticed the police pulling up behind the vehicle. In addition, co-defendant

K. B. T testified that a handgun was tossed into his lap from one of the defendants in the back seat. Appellant, M. J. H., was seated in the back, on the left-hand side of the vehicle. The contraband and the handgun were in plain view for over two minutes prior to being tossed out the passenger's window.

According to Officer Reeves, it seemed K. B. T. was the only one who could have thrown articles out of the window at the time of the stop, and it did not appear that any of the people in the back seat could have thrown the items out.

Officer Reeves testified his search of appellant's person revealed nothing of pertinence, and that the sole reason appellant was arrested for possession of cocaine and a weapon was his spatial proximity to those items. The second arresting officer also acknowledged that the reason for M. J. H.'s arrest is that he was in a car where somebody possessed cocaine.

After the denial by the court of appellant's motion to dismiss, three of appellant's co-defendants took the stand and testified that they had in fact been out selling drugs for a lady in DeKalb County, but that M. J. H. was not involved in such activity. Generally, the testimony of these three totally exonerated appellant of any possession or distribution of cocaine, but D. P. said on cross-examination that he assumed appellant knew D. P. had the cocaine, "because I was out there [selling] it in front of his face," but that he never told appellant he "had told [the lady] on the phone to bring me any more."

Appellant contends, obviously, that the evidence is insufficient to support a finding that he had knowledge or possession of the cocaine and the gun, and that mere presence at the scene of a crime is all that was proved. Specifically, he cites *Shirley v. State*, 166 Ga. App. 456-457 (304 SE2d 468): "The evidence does not show actual possession by Tharpe, and to support a [showing] that he was in constructive possession of the contraband the circumstantial evidence must be both consistent with the hypothesis of guilt and must exclude every other reasonable hypothesis. *Mitchell v. State*, 150 Ga. App. 44, 46 (2) (256 SE2d 652) (1979). 'A finding of constructive possession must be based upon some connection between the defendant and the contraband other than spatial proximity.' Id. No such connection was shown in this case. At most, the state's evidence showed that Tharpe rode in an automobile with three other persons, all of whom who had equal opportunity to commit the crime. In fact, the evidence showed actual possession by Shirley, not the other three defendants. Evidence of mere presence at the scene of the crime, and nothing more to show participation of a defendant in the illegal act, is insufficient to support a conviction. *Huncke v. State*, 137 Ga. App. 299, 300 (223 SE2d 492) (1976). Applying these principles to the facts of the instant case,

the evidence is insufficient to support Tharpe's conviction of posses-
sion of the contraband."

The State argues, however, this case is controlled by *Blaise v.
State*, 185 Ga. App. 653 (365 SE2d 499), where constructive posses-
sion was shown by more than mere "spatial proximity," with evidence
appellant had equal access and was party to the crime and, thus, was
in joint constructive possession of the contraband. But *Blaise* is sig-
nificantly distinguished from this case. In *Blaise*, appellant had been
in a van with the proven drug dealer for seven hours, during which
the van stopped at residences of two suspected drug dealers, and then
went to a lounge known as a common place for street sales.

In this case, appellant M. J. H. was shown to have been in this
Chevrolet for approximately one hour before it was stopped. The only
competent evidence that M. J. H. took part in any drug activity was
D. P.'s statement that he *assumed* M. J. H. knew he had cocaine be-
cause "I was out there [selling it] in front of his face." Moreover, we
must reject as hearsay certain evidence advanced by the State that
M. J. H. was involved as the "muscleman," based upon statements
by appellant's co-passengers A. H. and K. B. T. that "the lady" had
got appellant there or put him there to watch or protect D. P. be-
cause of a prior threat made against D. P. Therefore, if the evidence
argued by the parties were all that arose in the case, we would be
inclined under *Shirley*, supra, to say the adjudication of guilt was in-
supportable because all that was *competently* shown was M. J. H.'s
mere presence, for an hour, in a car peopled with drug dealers; and
even if he "assumedly" saw one of them sell drugs, this still does not,
to the exclusion of every other reasonable hypothesis, prove that he
did see it, and does not prove joint possession. In fact, there was ex-
onerating evidence that while the others had been selling drugs since
early in the afternoon of that day, M. J. H. had joined them an hour
before, looking for his brother A. H., and was only in the car hitching
a ride to a party with the others.

Thus, the evidence argued by the parties on appeal leaves more
questions than answers. However, when we comb the record, we find
the evidence that legally persuaded the trial court of M. J. H.'s de-
linquent involvement in the crimes. The three co-defendants who tes-
tified, A. H., D. P., and K. B. T., all testified that they were directly
involved in the sale of drugs for "the lady," who was A. B.'s (the
driver's) aunt. A. B. did not testify. The "lady," Melody Banks, con-
trolled the drug dealers; she provided them with the drugs, appar-
ently directly and with the assistance of her nephew A. B., and set
them up or assigned them to certain locations or areas, and then,
when they returned to her with their sale money, she gave them their
"cut." Melody Banks was a powerful woman who could put "a con-
tract" out on anyone who threatened her operations or one of her

dealers, and had been known to do so, having allegedly had one boy shot in the leg. K. B. T. had in fact seen this boy on crutches, and was therefore very afraid of Melody Banks. These three witnesses appeared, from the record, to be testifying under great emotional pressure of fear, to the point of tears and often stammering and even being praised by officers of the court for their courage in testifying despite their fear of the consequences. But, although D. P. was aware there was no evidence to convict him, he testified because he "felt that everybody else was fixing to get guilty, and we're the ones [who] should be guilty and not [M. J. H.] 'cause he didn't do [anything]."

The three passengers testified generally, as follows: K. B. T. and A. H. and the driver A. B. (Melody Banks' nephew) had gotten a "package" from Melody Banks, about $500 worth each, at about 1:00 or 2:00 p.m. and had been selling drugs all that day. D. P. was in another project near Fulton Industrial, selling drugs. M. J. H. evidently had made no appearance, but at some point late at night, apparently, he went to Melody Banks' house to look for his brother, A. H., Melody Banks took M. J. H. in her car to where D. P. was "stationed"; since D. P. and M. J. H.'s brother were very close, M. J. H. knew that wherever D. P. was, he would find A. H.

However, D. P. also testified that he and M. J. H. were "out there, and then I called her and told her to come pick us up"; when he called the lady, D. P. told her on the phone to bring him more drugs, but he testified he did not tell M. J. H. he had told "the lady" to bring more cocaine. Apparently soon thereafter, A. B. (who had been selling drugs in another area with K. B. T. and A. H.) came and picked up D. P. and M. J. H. in his car (which according to one of the witnesses, was actually Melody Banks' car). Evidently when they were stopped by police, they were on their way "back to Decatur . . . to take the lady the money back" from their sales, after which they had intended to go to a party at the National Guard Armory in Marietta in Cobb County. It was maintained by all that M. J. H.'s only design was to get with his brother and go to the party in Marietta.

All of this evidence, when resolved in favor of the adjudication as we are required to do on appeal, points directly to the conclusion that M. J. H. was not merely present at the scene of a crime, but was a knowing participant. According to D. P., he and appellant M. J. H. were together at their location *before* "the lady" came and *before* D. P. called her to tell her to bring more drugs, which she did. The evidence is resolved beyond a reasonable doubt and to the exclusion of every other reasonable hypothesis, by the conclusion that Melody Banks did not merely drive to D. P.'s location to deliver M. J. H. so that M. J. H. could find his brother when the whole group of drug sellers rendezvoused, but that M. J. H. was already with D. P. when

the lady drove to their location to bring more drugs. D. P. sold drugs in front of M. J. H.'s face. When A. B. and K. B. T. and appellant's brother A. H. arrived, the group altogether had a large amount of drugs unsold, and not very much money, relatively speaking. D. P. admitted the $200 found stuffed under the seat was his; although the State has not made it entirely clear, it appears the only other money found in possession of the others was no more than $60-70.

The only reasonable deduction is that instead of being on their way to deliver their money to Melody Banks, the group was just beginning their drug odyssey or was continuing it afresh after she had just delivered more drugs to D. P. in M. J. H.'s presence. The record is clear that the entire night's activities, and all the actors, were solely and thickly involved in the sale of cocaine for Melody Banks.

Even if the evidence could be resolved to show that M. J. H. had simply called at Melody Banks' house to find his brother, the evidence is so redolently charged with Banks' reputation as a powerful woman who controlled a drug dealing ring, that it is unreasonable to hypothesize M. J. H. did not know what his brother and D. P. were doing in association with Melody Banks.

And going further, even if M. J. H. ostensibly had initially no idea of Melody Banks' reputation and activities, or what his brother was doing in association with Melody Banks, or how it was that he could find his brother through her or by going to her house, it is utterly unreasonable to hypothesize that M. J. H. could not have soon known and suspected what they all were doing. The evidence which attempts to exonerate M. J. H. in this fashion points instead directly to a "ring" or association of young men (juveniles) who were doing something as a group, or in groups, for or under direction of Melody Banks. Not to be facetious, but only to make the point clear, it had to be known to M. J. H. that Melody Banks was not directing from her house a service which kept social tabs on certain persons and provided chauffeur services for them and their friends and relatives, but was clearly engaged in directing an illegal activity. In the best light of all the evidence, M. J. H. had full knowledge of the nature of the evening's activities when he went to Melody Banks' house and had her drive him to where D. P. was selling drugs; he was there when D. P. was selling drugs "in front of his face," and he then got in a car with D. P. and others, including his brother A. H., who he knew were directly involved with Melody Banks and her activities, and who he therefore knew possessed and had been selling and were selling and carrying drugs.

We find the evidence strongly provides the basis from which a rational trier of fact could adjudicate delinquency upon the charges alleged, as party to the crimes, in joint possession of the contraband and drugs, beyond a reasonable doubt and to the exclusion of every

other reasonable hypothesis. See *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560).

It follows that the adjudication was not contrary to the evidence or the law, nor contrary to equity and justice.

2. We find no merit in appellant's argument that the petition should have been dismissed because it charged him with possession of and intent to distribute a "derivative" of cocaine, where as it was proved that the proven drug, "crack," is not technically a derivative of cocaine but *is* cocaine. The State's laboratory expert testified that in laymen's terms, a "derivative of cocaine" refers to other forms of the white powdery substance known generally as cocaine. A variance between the allegations and proof is not fatal under *DePalma v. State*, 225 Ga. 465 (169 SE2d 801), if the accused has definitely been informed by the petition of the charges against him so that he may be enabled to present his defense and not be surprised by the trial evidence, and so that he may be protected against prosecution for the same offense. Id. pp. 469-470.

The original detention complaint filed against M. J. H. in Cobb County Juvenile Court on November 28, 1988, charged him with possession of "suspected cocaine ('crack') . . . being (2) clear plastic bags containing (46) individual bags containing suspected 'crack'. . . ." There is no reasonable probability that appellant misunderstood the formal complaint against him to describe a different "form" of cocaine than "crack." In fact, appellant points to no evidence of surprise, and no actual harm in having to defend against the charge of possessing a "derivative" of cocaine (in laymen's terms, "crack") as opposed to "cocaine." The variation here is technical and trivial, under all the circumstances of this case. See *Foster v. State*, 142 Ga. App. 805, 807 (237 SE2d 455). It would certainly not allow him to be tried again for possession of "cocaine" under the same evidence. The variation, if it truly was one, was therefore not fatal.

*Judgment affirmed. Deen, P. J., and Benham, J., concur.*

DECIDED NOVEMBER 21, 1989.

*Greene & Davis, Kenneth R. Croy*, for appellant.

*Thomas J. Charron, District Attorney, Amy H. McHesney, Assistant District Attorney*, for appellee.